# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 25-453L
(Filed: October 23, 2026)

| | |
|---|---|
| **M. L. ONNA BARRY**, *et al.*, *Plaintiffs*, v. **UNITED STATES**, *Defendant*. | ) |

*Steven M. Wald*, Stewart, Wald & Smith, LLC, St. Louis, Missouri, for plaintiffs. With him on the briefs were *Michael J. Smith* and *Allison P. Bettlach* (argued), Stewart, Wald & Smith, LLC, St. Louis, Missouri; and *Thomas S. Stewart* and *Reed W. Ripley*, Stewart, Wald & Smith, LLC, Prairie Village, KS.

*Kenneth G. Long* (argued), Senior Attorney, Environmental Enforcement Section, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs was *Adam R. F. Gustafson*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER[1]

***BONILLA, Judge*.**

Landowners in Henderson and Transylvania counties, North Carolina, seek just compensation under the Fifth Amendment for the government's alleged taking of their property stemming from the conversion of a rail corridor into a public linear park under the National Trail Systems Act (Trails Act), 16 U.S.C. §§ 1241–51. Pending before the Court are cross-motions for summary judgment addressing liability. The central question is whether plaintiffs owned a cognizable property

[1] This case was transferred to the undersigned for adjudication on September 2, 2026, pursuant to Rule 40.1(b) of the Rules of the United States Court of Federal Claims (RCFC).

interest in the contested land on the date of the alleged taking. The short answer is no. Accordingly, plaintiffs' motion is denied, and defendant's cross-motion is granted.

## BACKGROUND

The critical facts of this case date back to the late nineteenth century. In early 1891, the North Carolina General Assembly chartered the Hendersonville and Brevard Railway, Telegraph and Telephone Company (HBR).[2] The shortline railroad and communications company acquired the assets of the abandoned French Broad Valley Railroad Company and its name from the intended 21.6-mile route between Hendersonville and Brevard.[3] To secure the land on which to build the rail line (rail corridor), HBR executed a series of deeds between 1894 and 1895 (source deeds), nine of which are at issue here.[4] After HBR went bankrupt in 1897, the railroad's assets, including the rail corridor, were purchased at auction by J. Frances Hayes for $95,000, passed to the Toxaway Company, and reorganized as the Transylvania Railroad Company. In the early 1900s, the Southern Railway purchased a controlling interest in the railroad, absorbing the Transylvania Railroad Company in 1906.[5] In 1982, Southern Railway merged with the Norfolk and Western Railway to form the Norfolk Southern Railway Company (NSRC). *See Norfolk S. Corp.–Control–Norfolk & W. Ry. Co. and S. Ry. Co.,* 366 I.C.C. 173 (1982). Watco Companies, LLC acquired the railroad assets in June 2014 and formed the Blue Ridge Southern Railroad (Blue Ridge). *See* 79 Fed. Reg. 40204 (July 11, 2014); ECF 15-6 (Quitclaim Deed 1596-628 from NSRC to Blue Ridge (July 25, 2014)).

On October 26, 2020, Blue Ridge and Ecusta Rails2Trails LLC (Ecusta) signed an Interim Trail Use/Railbanking Purchase Agreement, through which Blue Ridge agreed to sell its rights and interest in, and title to, the inactive 19.1-mile rail corridor

---

[2] An Act to Incorporate the Hendersonville and Brevard Railway, Telegraph and Telephone Company, ch. 360, 1891 N.C. Sess. Laws 431, *available at* ECF 15-1 at 3–6.

[3] Jerry Ledford, *A Brief History of the Railroad from Hendersonville to Lake Toxaway*, Etowa NC Heritage, *available at* https://perma.cc/U6HL-ELG9.

[4] HBR's charter authorized the railroad:

> to acquire, hold, sell and convey real and personal property to such an extent as to them may seem proper, and take title thereto in the name of the corporation, and convey the same through their officers in the same way that other corporations are now by law authorized to convey real estate : *Provided*, that the said corporation shall not at any time hold more than ten thousand acres of land.

1891 N.C. Sess. Laws 431 § 2.

[5] *See In Transylvania County (1861–1911)*, The Transylvania Heritage Museum, *available at* https://perma.cc/R9A7-VGE9; Ledford, *supra* note 3; John Leynes, *Hendersonville & Brevard Railroad Telegraph & Telephone Co.*, Ry. & Locomotive Hist. Soc'y, Inc. (Southeast Chapter), no. 114, Aug. 2009, at 2, *available at* https://perma.cc/H9GV-3LEN.

to Ecusta pursuant to the Trails Act for $7.76 million.[6] Blue Ridge initiated a formal exemption proceeding on April 7, 2021, filing a Verified Notice of Exemption with the Surface Transportation Board (STB) pursuant to 49 C.F.R. § 1152.50. While the April 7, 2021 notice nominally sought authority to abandon the 19.1-mile rail corridor, Blue Ridge made clear that it was "seeking abandonment authorization to render the Line eligible for an interim trail[] use pursuant to 16 U.S.C. §1247(d). . . . [Blue Ridge] does not intend to consummate abandonment of the line." ECF 13-2 at 6; *accord id.* at 5 ("[Blue Ridge] anticipates that abandonment authorization will facilitate interim use of the Line as a public recreational trail, consistent with 16 U.S.C. § 1247(d)."). The STB granted the exemption on April 27, 2021, with an effective date of May 27, 2021. Consistent with Blue Ridge's April 7, 2021 representation, Blue Ridge and Ecusta filed a Joint Petition for Interim Trail Use and Notification of Trail Use/Railbanking Agreement on June 16, 2021.[7] The STB issued the requested Notice of Interim Trail Use or Abandonment (NITU) on June 29, 2021. The same day, Blue Ridge and Ecusta notified the STB that they had reached a Trail Use Agreement. Blue Ridge then executed a special warranty deed on August 12, 2021, transferring the rail corridor to Ecusta "in fee simple." ECF 15-8 at 3.

On March 11, 2025, seven residents and a local volunteer fire department of Henderson and Transylvania counties filed this Fifth Amendment takings action.[8] The parties agree the remaining plaintiffs owned land adjacent to the rail corridor on June 29, 2021, when the STB issued the NITU. The conflict lies in the property interest HBR acquired from the predecessors-in-title to the plaintiffs 132 years ago:

| Plaintiff | Source Deed | Date | ECF 15 |
|---|---|---|---|
| M. L. Onna Barry | J. W. & Onnie Morgan | Aug. 22, 1894 | Ex. 9 |
| Sherri Leigh Bethel | J. H. Ripley | Oct. 22, 1894 | Ex. 10 |
| | Hugh F. & C. A. Johnson | Aug. 23, 1894 | Ex. 11 |
| | M. J. & C. B. Allen | Aug. 23, 1894 | Ex. 12 |
| Kimberly Collins | Fielding Cantrell | Aug. 23, 1894 | Ex. 13 |
| | Wm. N. & E. C. Corn | Aug. 23, 1894 | Ex. 14 |
| Jeffrey Hart | Butler & S. E. Capps | Aug. 23, 1894 | Ex. 15 |
| Kevin Landrum | J. H. Ripley | Oct. 22, 1894 | Ex. 10 |

[6] Ecusta is "a subsidiary of Conserving Carolina, . . . formed to acquire the railbanked corridor with the support of local and state grants and private donors." *Our History,* Friends of the Ecusta Trail, *available at* https://perma.cc/N6JF-B3RU. The community-based effort "to repurpose the abandoned 19+ mile [railway] spur . . . and transform it into a multi-use greenway" dates to 2009. *Id.*

[7] The STB's April 27, 2021 grant of abandonment exemption included a May 7, 2021 deadline for filing for interim trail use/rail banking requests. ECF 13-3 at 3. The STB excused Blue Ridge and Ecusta's late filing for good cause. *Compare* ECF 13-4 at 3 ("Good Cause for Late-Filed Request"), *with* ECF 13-1 at 2 (issuing Notice of Interim Trail Use or Abandonment notwithstanding untimely request).

[8] The original plaintiffs included Henderson County residents M. L. Onna Barry, Sherri Leigh Bethel, Kimberly Collins, Jeffrey Hart, Kevin Landrum, and James Quinn; Transylvania County resident Ronald Lyday; and the Little River Volunteer Fire Department, located in Transylvania County. On April 1, 2026, Messrs. Quinn and Lyday voluntarily dismissed their claims without prejudice.

| | | | |
|---|---|---|---|
| Little River Volunteer | G. W. & Mattie Allison | Nov. 2, 1894 | Ex. 16 |
| Fire Department | W. M. & S. M. Allison | Nov. 2, 1894 | Ex. 17 |

If, as the government contends, HBR acquired the contested land in fee simple under the 1894 source deeds, plaintiffs would not have a cognizable property interest in the contested rail corridor. Conversely, if as plaintiffs maintain, HBR acquired only a right-of-way easement for the limited purpose of operating the planned railroad—by deed or through prescriptive easement—the STB's June 29, 2021 facilitation of the rail-to-trail conversion could constitute a permanent taking of plaintiffs' properties. *Cf. Barron v. United States*, __ F.4th __, No. 25-1179, 2026 WL 3160493, at *2 (Fed. Cir. Oct. 22, 2026) ("If [the deeds] conveyed an interest in fee simple, there was no reversionary interest left to the Landowners' predecessors-in-interest, [and] no taking occurred . . . . Conversely, if they conveyed only an easement for railroad use, there was a reversionary interest, and . . . the Claims Court [must] determine the nature and status of the easement." (citations omitted)). Plaintiffs seek to recover the fair market value of their extinguished property rights.

## DISCUSSION

I. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine dispute exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts, in turn, are those "that might affect the outcome of the suit." *Id.* In deciding motions for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party, evaluating each motion on its own merits. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing *Anderson*, 477 U.S. at 248). Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

II. Fifth Amendment Taking

A compensable Fifth Amendment claim requires a cognizable interest in the property allegedly taken. *Palmyra Pac. Seafoods, LLC v. United States*, 561 F.3d 1361, 1364 (Fed. Cir. 2009) (citing *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998)). In Trails Act cases, the initial inquiry is whether the railroad acquired fee simple title in the land underlying the contested rail corridor or merely secured a railway easement over the owner's burdened freehold estate. *Preseault v. United States*, 100 F.3d 1525, 1533–34 (Fed. Cir. 1996) (en banc). Where the railroad secured only right-of-way easements, two follow-on questions remain:

> [W]ere the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and . . . even if the grants of the [r]ailroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements[?]

*Id.* at 1533. Property rights in rails-to-trails cases are governed by the relevant state's law. *Castillo v. United States*, 952 F.3d 1311, 1319 (Fed. Cir. 2020) (citation omitted). In this case, North Carolina law governs.

Plaintiffs' principal argument is that unresolved latent ambiguities in the 1894 source deeds render them unenforceable, leaving HBR and its successors-in-interest with a prescriptive railroad easement across plaintiffs' burdened freehold estates. Plaintiffs alternatively assert that the 1894 source deeds, to the extent enforceable, conveyed only a railroad right-of-way easement and, further, that the public trail sanctioned by the STB exceeded the scope of any conveyed easement.[9]

Before turning to these arguments, the Court addresses the representativeness of the October 22, 1894 J. H. Ripley deed. Both parties accepted the Ripley deed as an exemplar source deed. And, as noted in the chart above, it is the source deed for two of the six remaining plaintiffs (i.e., Bethel and Landrum). The conveyance from "J H Ripley to R.R. Co" provides:

> In consideration of the benefits to be [by me] derived from the construction of its Railroad through my premises in said state and county particularly described as follows—that property in the town of Hendersonville known as the Ripley tan yard property and the property above Erraits Mill known as Fuller Ford property and of one dollar for me in hand paid thereupon whereof is hereby acknowledged. I J.H. Ripley of said county to give[,] grant[,] bargain[,] sell[,] and convey

[9] Plaintiffs declined to assert that any railway easements terminated prior to the date of the claimed taking. ECF 13 at 17 n.2.

> to the Hendersonville and Brevard Railway Telegraph and Telephone Company and its successors forever a strip of land of sufficient width upon which to locate[,] construct[,] and operate and maintain a standard gauge rail road through said premises which is or may be staked or marked out by the engineer or engineers of said company and indicated upon the map by him or them and the president of said company placed on file in the office of the Clerk of said Henderson County as required by law such strip so marked out and indicated to be the land hereby conveyed provided that this deed shall be void unless said railroad company shall have constructed a railroad through said premises on or before the first day of August 1895. Witness my hand & seal this the twenty[-]second day of Oct. A.D. 1894.

ECF 13-34 at 2–3; ECF 15-10 at 2–4.[10]

The Court notes that while both parties treated the Ripley deed as representative in their briefs, there are a couple of salient differences among the source deeds. In fact, during oral argument, the parties concentrated on the August 23, 1894 Fielding Cantrell deed, which transferred "a strip of land 75 feet wide provided that said rail road shall be completed and in operation on or before the first day of January 1897 . . . ."[11] ECF 15-13. Among the source deeds, only the Cantrell deed refers to a specific width rather than to the more generic "strip of land of sufficient width."

Although neither party mentioned this fact, the deeds also provide different deadlines for when the railroad must be "constructed" for the deed to be valid:[12]

| **Source Deed** | **Date** | **Deadline** | **ECF 15** |
|---|---|---|---|
| J. W. & Onnie Morgan | Aug. 22, 1894 | Jan. 1, 1897 | Ex. 9 |
| J. H. Ripley | Oct. 22, 1894 | Aug. 1, 1895 | Ex. 10 |
| Hugh F. & C. A. Johnson | Aug. 23, 1894 | Jan. 1, 1897 | Ex. 11 |
| M. J. & C. B. Allen | Aug. 23, 1894 | Jan. 1, 1897 | Ex. 12 |
| Fielding Cantrell | Aug. 23, 1894 | Jan. 1, 1897 | Ex. 13 |
| Wm. N. & E. C. Corn | Aug. 23, 1894 | Jan. 1, 1897 | Ex. 14 |
| Butler & S. E. Capps | Aug. 23, 1894 | Jan. 1, 1897 | Ex. 15 |
| G. W. & Mattie Allison | Nov. 2, 1894 | Jan. 1, 1897 | Ex. 16 |
| W. M. & S. M. Allison | Nov. 2, 1894 | Jan. 1, 1895 | Ex. 17 |

---

[10] *See also* ECF 13 at 24 (providing a substantively identical transcription).

[11] At oral argument, plaintiffs read the width as "25 feet" while the government read the width as "75 feet." If the deed were to read 25, there might be a taking as to the difference between the 25 feet conveyed in fee simple and the 75 feet represented on the 1916 Interstate Commerce Commission valuation map, which is discussed in greater detail *infra*. *See* ECF 15-18 at 7. The plaintiffs did not make, and have therefore waived, this argument.

[12] The Cantrell deed, unlike the other deeds, specifies that the railroad must be "completed *and in operation*," ECF 15-13 (emphasis added), and not just "constructed," ECF 15-9, ECF 15-10, ECF 15-11, ECF 15-12, ECF 15-14, ECF 15-15, ECF 15-16, ECF 15-17.

The Court takes judicial notice of the fact that contemporaneous accounts record the rail corridor being completed during the summer of 1895.[13] Neither party contends the deeds were voided for failure to timely construct the railroad.

A. Latent Ambiguity

Plaintiffs argue the original source deeds contain latent ambiguities regarding, in turn, the description of the parent parcels from which the conveyances stemmed, and the specific "strip of land" within the parent parcels conveyed to the railroad. This Court has considered—and rejected—claims by neighboring landowners in Henderson County, North Carolina, that the description of the parent parcel in the same Ripley source deed is void for vagueness, explaining:

> Of consequence, the deed references "that property in the town of Hendersonville known as the Ripley tanyard property and the property above Erraits Mill known as [F]uller [F]ord property." Reference to other property in a deed as a method of describing land has been upheld in North Carolina. For example, in *McCotter v. Barnes*, the deed described the property as "a tract or parcel of land . . . situated, lying and being in the county and State aforesaid and in No. 3 township adjoining the lands of *C. A. Flowers, S. H. Muse and others* . . . ." Further, in *McCotter,* the court rejected the idea that a more precise metes and bounds description was necessary. The Ripley [d]eed, like the *McCotter* one, describes the land by reference to other property. Accordingly, the Court finds the Ripley [d]eed, like the other source deeds, has sufficient detail to identify the property and is therefore a valid deed.

*Bevirt v. United States*, 177 Fed. Cl. 275, 281–82 (2025) (first alteration in original) (footnote omitted) (first quoting ECF 13-34 at 2;[14] then quoting *McCotter v. Barnes*, 101 S.E.2d 330, 332 (N.C. 1958); and then citing *McCotter*, 101 S.E.2d at 334–35), *reconsideration denied*, 180 Fed. Cl. 217 (2026), *appeal dismissed per stipulation*, No. 26-1703 (Fed. Cir. Oct. 16, 2026). To be clear, in rejecting plaintiffs' claims, Judge Hadji's evaluation focused on whether the description of the parent parcel was

---

[13] The *Railroad Gazette* tracked the progress of the construction: On May 31, 1895: "The [Hendersonville & Brevard] road will be completed by July 10, it is announced." 27 *Railroad Gazette: A Journal of Transportation, Engineering and Railroad News* 354 (New York, 32 Park Place 1895), *available at* https://babel.hathitrust.org/cgi/pt?id=chi.15967696&seq=1 (last visited Oct. 22, 2026). On July 12, 1895: "[T]he track w[ill] be laid into the terminus at Brevard, N.C., by Aug. 1, or soon after that date." *Id.* at 473. On August 2, 1895: "The road is now practically completed." *Id.* at 523. On November 8, 1895: "This railroad has been formally opened for regular freight and passenger traffic for its entire length of 21 miles, from Hendersonville, to Brevard, N.C." *Id.* at 747.

[14] For clarity, this cite refers to the identical October 22, 1894 J. H. Ripley deed used as the exemplar source deed in both this case and *Bevirt*.

*patently* ambiguous. *See id.* at 281. Here, even assuming the description is *latently* ambiguous, the ambiguity is easily resolved.

North Carolina caselaw is clear that "a latent ambiguity raises a question of identity. If the ambiguity is latent, evidence dehors [outside of] the contract is both competent and necessary." *Lane v. Coe*, 136 S.E.2d 269, 273 (N.C. 1964). Describing property by its commonly known name suffices to admit evidence identifying it. *See Carolina Power & Light Co. v. Waters*, 133 S.E.2d 450, 452 (N.C. 1963) ("Where property either real or personal has a known and commonly used and recognized name, the use of this name to describe and identify the property sold is an adequate description, that is, it is sufficient to permit the introduction of evidence to show that the property claimed is in fact the property named."). There is no question as to whether it is possible to identify the parent parcels from the descriptions in the source deeds; plaintiffs themselves have successfully done so, and the government agrees with their identifications.

Instead, the source deeds' identification of the specific "strip of land" within the parent parcels conveyed to the railroad presents a less easily resolvable latent ambiguity under North Carolina law. "A description is said to be latently ambiguous if it is insufficient in itself to identify the property but refers to something extrinsic by which identification might possibly be made." *Lane*, 136 S.E.2d at 273. The relevant portion of the exemplar Ripley deed purports to convey:

> a strip of land of sufficient width upon which to locate[,] construct[,] and operate and maintain a standard gauge rail road . . . *which is or may be staked or marked out by the engineer or engineers of said company and indicated upon the map by him or them and the president of said company placed on file in the office of the Clerk of said Henderson County as required by law* . . . .

ECF 13-34 at 2–3 (emphasis added); ECF 15-10 at 2–4 (same). On its face, the source deed references a complementary railroad engineer's or engineers' map and physical markers "staked or marked out by the engineer or engineers"—which may or may not predate the deed—to identify the specific "strip of land" conveyed. *Cf. Duckett* v. *Lyda*, 26 S.E.2d 918, 919 (N.C. 1943) ("[A deed] must set forth a subject matter, either certain in itself or capable of being reduced to a certainty by a recurrence to something extrinsic to which the deed refers." (citations omitted)). The greater difficulty in resolving this latent ambiguity compared to the identification of its parent parcel stems from the deed's apparent reliance on the referenced engineers' maps.

Neither party produced the cited engineers' maps.[15] And notwithstanding the actual construction of the rail corridor and its subsequent operation for some

[15] During oral argument, counsel related the exhaustive efforts undertaken to locate the engineers' maps.

125 years, no definitive evidence is presented that the engineers' maps were created; or, if they were, that they were duly filed with the county clerk and later lost or destroyed.[16] Against this backdrop, plaintiffs contend that the source deeds suffer from an unresolved latent ambiguity, relegating HBR's interest in the corridor to a prescriptive railway right-of-way easement.

In takings cases, plaintiffs bear the ultimate burden of proving their property interest. *CCA Assocs. v. United States*, 667 F.3d 1239, 1245 (Fed. Cir. 2011); *accord Estate of Hage v. United States*, 687 F.3d 1281, 1291 (Fed. Cir. 2012) ("It is the [plaintiffs'] burden to establish cognizable property interests for the purposes of their takings claims."). The government, however, relies on the source deeds to rebut plaintiffs' claimed ownership interest in the disputed rail corridor. North Carolina law places the burden of fitting a deed's description to the land on the party relying on the deed. *See Lane*, 136 S.E.2d at 274 ("The burden was upon the [proponent of the deed] to identify the property referred to in the contract."). As discussed *infra*, the government carried its burden: the rail corridor's location is undisputed; the valuation maps, on which plaintiffs also rely, identify the parent parcels and the rail corridor; and plaintiffs offered no evidence "tending to show impossibility of identification," which *Lane* permits the deed's opponent to offer. *See id.* at 273.

Plaintiffs' theory of the case is that the latent ambiguity in the source deeds can only be resolved by the railroad engineers' maps referenced in them. Because the engineers' maps cannot be found, the argument goes, the latent ambiguity cannot be resolved, and the deeds are thus void. Although facially appealing, the North Carolina Supreme Court previously addressed a remarkably similar situation: a deed granted to a railroad a tract of land specified by a particular survey that was not in evidence. *See Tighe v. Seaboard Air Line R.R. Co.*, 97 S.E. 164, 166 (N.C. 1918). In that case, the deed conveyed "so much of an acre tract of his land (describing the land) as may be taken in constructing the connection between the Raleigh & Gaston and North Carolina Railroad Company *according to the survey made by Ed Myers, civil engineer*." *Id.* (emphasis added). In North Carolina, a railroad could enter land and build a railroad without permission of the landowner. William T. Joyner, *Railroads—Right-of-Way—Statutory Limitation Barring Recovery Therefor*, 27 *N.C. L. Rev.* 579, 580 (1949) (collecting cases). The owner could then bring a statutory action for compensation. *Id.* (collecting cases). In such a proceeding, either party could request to limit the width of the right of way, but if neither party did so, then the railroad acquired a right of way of the maximum width that it could condemn under its charter or, if its charter was silent on this point, to fifty feet on either side, as provided by

[16] *See Postal Tel. Cable Co. v. S. Ry. Co.*, 89 F. 190, 193 (C.C.W.D.N.C. 1898) ("It was also insisted that section 1952 [of N.C. Code of 1883] provides for maps of the route to be made and filed in the office of the clerk of the court of the county through which the road may run. This provision applies to steps antecedent to the filing of the petition for condemnation, indicating the proposed route, and allowing objections to be made, so that it may be altered, if necessary."); *id.* at 195 (noting that "section 1952 [was] repealed" in 1893).

general law. *Id.* (collecting cases). The *Tighe* court found that because the deed referenced a survey, the width of the right of way was "restricted to the boundary described in its deed." *Tighe*, 97 S.E. at 167. As the Myers survey was not in evidence, the court remarked that "the presumption is that Ed Myers, the civil engineer, laid out the right of way to the full 80 or 100 feet width, as authorized by the charter," but that this presumption "is subject to the evidence tending to show that only one-quarter of an acre was used and occupied by the railroad company under the Ed Myers survey . . . ." *Tighe*, 97 S.E. at 166.[17] The court found that the evidence was in fact sufficient to rebut the presumption.

Applying the logic of *Tighe* to this case, the rebuttable presumption is that the missing engineers' maps documented that the railroad had 50 feet on either side under general law (except as to the Cantrell deed, which fixed the total width at 75 feet) because the HBR charter was silent as to width. While *Tighe* did not explicitly address whether the absence of the Myers survey rendered the deed void because of a latent ambiguity, the question of the deed's validity is analytically prior to that of its construction. Logic dictates that, if the absence of the survey rendered the deed void, there would be no need for a rule governing how much land an absent survey should be presumed to convey.

The reason the missing Myers survey did not threaten the validity of the deed in *Tighe* presents a puzzle on first impression.[18] It is a basic rule of property that "a deed conveying land within the meaning of the statute of frauds must contain a description of the land, the subject matter of the deed, either certain in itself or capable of being reduced to certainty by reference to something extrinsic to which the deed refers." *Cherry v. Roanoke Tobacco Warehouse Co.*, 75 S.E.2d 124, 128 (N.C. 1953). "[A]nd the deed must speak for itself; it cannot be added to, varied or contradicted by parol evidence." *Dail v. Jones*, 85 N.C. 221, 223 (1881) (citing *Wilson*

---

[17] Although not material to the decision reached today, *Tighe* is seemingly internally inconsistent as to the number of feet authorized by the railroad charters in that case. *Compare Tighe*, 97 S.E. at 166 ("80 or 100 feet width, as authorized by the charter"), *with id.* ("the 80 feet authorized right of way under the Raleigh & Gaston Railroad Company charter, or the 200 feet right of way authorized by the North Carolina Railroad Company charter").

[18] The Court considered sua sponte certifying the question to the North Carolina Supreme Court, only to realize that the Tar Heel State remains the only state lacking a federal certification mechanism. *See Stahle v. CTS Corp.*, 817 F.3d 96, 113 (4th Cir. 2016) (Thacker, J., concurring) (collecting cases); D. Martin Warf & Lorin J. Lapidus, *Closing the Certified Question Loop: An Approach for Establishing a Constitutional Certification Mechanism in North Carolina*, *N.C. State Bar J.*, Summer 2025, at 18, *available at* https://perma.cc/2LCF-C6XR; Rachel Koehn Breland, *Avoiding Rejection: Studying When and Why State Courts Decline Certified Questions*, 92 *Fordham L. Rev.* 1429, 1438 (2024) ("Today, forty-nine states and the District of Columbia have established procedures allowing their courts of last resort to answer certified questions from federal courts." (footnotes omitted)). Although the North Carolina General Assembly introduced House Bill 157, short-titled "Certifying Question Mechanism," on February 21, 2017, it was last referred to the Committee on Rules, Calendar, and Operations of the House on March 1, 2017. *See* N.C. Gen. Assemb., Reg. Sess. 2017-2018, H.B. 157 (last visited on Oct. 22, 2026), *available at* https://perma.cc/9WT4-9RWZ.

*v. Sandifer*, 76 N.C. 347 (1877)). Without the Myers survey, the deed in *Tighe* cannot speak as to the boundaries of the interest in land conveyed. When deeds for railroad rights of way are silent as to width, North Carolina courts have fixed the width according to the railroad charter or the general statute. *See Wearn v. N.C. R.R. Co.*, 132 S.E. 576, 578 (N.C. 1926) ("The law of North Carolina, as declared in many decisions, is to the effect that if a railroad company enters upon land under a deed or grant from the owner which purports to convey an unrestricted right of way and no definite quantity or width of land is specified, and thereafter constructs its road thereon, then it is presumed that the owner has granted to the company the width designated in the charter or in the general statute."); *accord Heaton v. Kilpatrick*, 143 S.E. 644, 645 (N.C. 1928) ("[I]n the absence of restrictions in a deed for a right of way over land conveyed to said company, the width of such right of way is 200 feet—that is, 100 feet on each side of the track.").[19] The same principle that a deed conveying an interest in land must sufficiently describe the land applies to both easements and fee simple. *See Overton v. Boyce*, 221 S.E.2d 347, 349 (N.C. 1976) ("A deed purporting to convey an interest in land is void unless it contains a description of the land sufficient to identify it or refers to something extrinsic by which the land may be identified with certainty." (citing cases)); *M. E. Gruber, Inc. v. Eubank*, 148 S.E. 246, 248 (N.C. 1929) ("An easement, of course, is an interest in land, and, if it is created by deed, either by express grant or by reservation, the description thereof must not be too uncertain, vague and indefinite." (citing cases)).

When assessing the width of a rail corridor, North Carolina courts take a capacious approach to the admissibility of extrinsic evidence. In *Tighe*, for example, the court found that the jury properly considered "evidence tending to show that only one-quarter of an acre was used and occupied by the railroad company . . . ." 97 S.E. at 166. In another case, a deed "g[ave], granted, and surrendered" to a railroad company "so much and no more of the lands belonging to, owned, or held by [the grantors]" as the company "would have a right to condemn" for its use. *Seaboard Air Line R.R. Co. v. Olive*, 55 S.E. 263, 265 (N.C. 1906). As here, the deed identified the land to be conveyed by reference to the as-yet-unconstructed railroad. The *Olive* court determined that it "must hold either that it is void for uncertainty, or find some standard by which to apply the maxim, '*Id certum est quod certum reddi potest*'"—that is certain which can be made certain. *Id.* at 267 (emphasis added). The court concluded "that the deed was a valid grant of a right-of-way, and that, read in the light of the [charter and background] statutes, its width was 100 feet, or 50 feet on each side of the center of the track." *Id.* at 268.

North Carolina courts' flexibility in constructing deeds is rooted in a principled preference in favor of upholding deeds: "The courts seek to sustain a deed if possible

---

[19] North Carolina provides that a deed granting a right of way to a railroad can convey either an easement or fee simple title, depending on context, *see McCotter*, 101 S.E.2d at 335. *Wearn* and *Heaton* concern easements, however, and it is not certain that a North Carolina court would apply a statutory presumption of width to a deed granting fee simple title to a railroad.

on the assumption that the parties intended to convey and receive land or they would never have been involved in the first place." *Deutsche Bank Nat'l Tr. Co. v. Gaydos*, 921 S.E.2d 165, 170 (N.C. Ct. App. 2025) (quoting *Chi. Title Ins. Co. v. Wetherington*, 490 S.E.2d 593, 597 (N.C. Ct. App. 1997)). *See also Duckett*, 26 S.E.2d at 919 ("It is presumed that the grantor in a deed of conveyance intended to convey something, and the deed will be upheld unless the description is so vague or contradictory that it cannot be ascertained what thing in particular is meant." (citations omitted)). "Although a description of real property must adequately identify the subject property, the law will support a deed if possible." *In re Thompson*, 799 S.E.2d 658, 662 (N.C. Ct. App. 2017). *See also Olive*, 55 S.E. at 267 ("The maxim, *'Ut res magis valeat quam pereat'* [let the thing have effect rather than perish], admonishes us that it is our duty to uphold the deed, if by reasonable construction, it can be done." (emphasis added)). Put simply, North Carolina courts have labored to uphold deeds. *See, e.g.*, *Chi. Title Ins. Co.*, 490 S.E.2d at 597 ("[T]here is ample evidence to support a finding that the [parties] were aware of the location of the residence tract despite the ambiguity contained in the description in the deed. Therefore, the trial court's finding and conclusion that the deed was void because of this ambiguity was in error.").

The Court considers it likely that the railroad engineers' maps in question were drafted and either not properly filed with the county clerk or later misplaced, lost, or destroyed. The source deeds envision the railroad to "be staked or marked out by the engineer or engineers of said company and indicated upon the map by him or them." ECF 13-34 at 2–3; ECF 15-10 at 2–4. The company did in fact build the railroad. It follows that the engineers likely staked or marked out a path before construction. After all, these engineering marvels are not constructed by laying tracks in the dark. If these logical deductions are correct, a "survey referenced in a deed becomes a part thereof and need not be recorded." *Edwards v. Hill*, 703 S.E.2d 452, 455 (N.C. Ct. App. 2010) (citing *Kaperonis v. Highway Comm'n*, 133 S.E.2d 464 (N.C. 1963)). "When a deed is lost or destroyed, there is no question its loss and contents may be proved by secondary evidence; but in all cases the best evidence, of which the nature of the case will admit, must be produced—a copy, for instance, if there be one, but if none, then parol evidence of its contents may be given." *Cowles v. Hardin*, 91 N.C. 231, 233 (1884) (citations omitted). All that said, notwithstanding the undersigned's musings, neither party has adduced concrete evidence that the railroad engineers' maps in question ever existed.

In any case, the source deeds do not point to the railroad engineers' maps alone. They also point to the physical staking or marking out of the railroad—and to the railroad itself. The parties do not dispute the location of the railroad. North Carolina law is clear that physical landmarks can be used to fix the location of property. Where the parties to the sale contemporaneously fixed the bounds of a property, the physical boundaries control. *See S.S.M. Realty Co. v. Boren*, 190 S.E. 733, 734 (N.C. 1937) ("It is settled beyond a controversy in [North Carolina] that a line surveyed and marked out and agreed upon by the parties at the time of the execution of the deed will control

the course and distance set out in the instrument." (quoting *Millikin v. Sessoms*, 92 S.E. 359, 361 (N.C. 1917) (per curiam)); *id.* ("[C]ourse and distance, or even what is considered in law a more certain or controlling call, must yield to evidence, if believed, that the parties, at the time of the execution of a deed, actually ran and located a different line from that called for, such evidence being admissible to show the description of the line to be a mistake." (quoting *Cox v. McGowan*, 21 S.E. 108, 109 (N.C. 1895))). The location of the railroad itself, however, does not fix the width of the land conveyed.

North Carolina law liberally allows extrinsic evidence to resolve latent ambiguities. When there is a latent ambiguity, parties "may offer evidence, parol and other, with reference to such extrinsic matter tending to identify the property." *Lane*, 136 S.E.2d at 273. "Boundaries may be proved by every kind of evidence admissible to establish any other fact." *Allison v. Kenion*, 79 S.E. 1110, 1111 (N.C. 1913) (quoting *Sherrod v. Battle*, 70 S.E. 834, 838 (N.C. 1911)). North Carolina permits the use of documents created after the execution of the deed to clarify a latent ambiguity. *See Brown v. Weaver-Rogers Assocs., Inc.*, 505 S.E.2d 322, 326 (N.C. Ct. App. 1998) ("There was abundant extrinsic evidence, including . . . the subsequently recorded maps of the respective properties, indicating the intent of the parties . . . . [T]he trial court should have considered the extrinsic evidence to resolve the latent ambiguity as to the identity of the . . . tract."). Even subsequent recognition and acquiescence can be considered. *See Hanstein v. Ferrell*, 62 S.E. 1070, 1071 (N.C. 1908) ("Recognition of, and acquiescence in, a line as the true boundary line of one's land, not induced by mistake, and continued through a considerable period of time, affords strong, if not conclusive, evidence that the line so recognized is the true line."); *Spears v. Randolph*, 86 S.E.2d 263, 266 (N.C. 1955) ("We have often held that common reputation, to be admissible, should have its origin at a time comparatively remote, always *ante litem motam* [before the controversy arose], and should attach itself to some monument of boundary or natural object, or be fortified by evidence of occupation and acquiescence tending to give the land some fixed and definite location." (emphasis added) (quoting *Peltz v. Burgess*, 145 S.E. 781, 781 (N.C. 1928)).

Evidence exists in this case that can determine the width of the property conveyed. "In 1913, Congress enacted the Federal Valuation of Common Carriers Act, which required the Interstate Commerce Commission" (ICC) to document "the grants of land to any such common carrier." *Pressly v. United States*, 174 F.4th 1368, 1377 (Fed. Cir. 2026) (quoting Act of Mar. 1, 1913, ch. 92, 37 Stat. 701, 702). To fulfill this statutory requirement, the ICC "required railroad companies to submit valuation schedules and maps that identified" the sources of the railroads' property interests. *Id*. In 1916, Southern Railway, the company then owning the rail corridor, duly submitted the required valuation schedules and maps to the ICC. Plaintiffs themselves find the valuation maps reliable, as they used them "to identify and then obtain the applicable conveyances concerning the Corridor at issue." ECF 13 at 14. The Federal Circuit has cited ICC valuation schedules as probative evidence. *See Pressly*, 174 F.4th at 1379.

The valuation maps resolve the latent ambiguity presented. The maps originated "at a time comparatively remote," *Peltz,* 145 S.E. at 781; indeed, over a century before this litigation. The valuation maps attach themselves to "some monument," *id.*, as they are tied to the location of the railroad. And they "give the land some fixed and definite location." *Id.* Moreover, both parties to this case have relied on the maps. While the valuation maps are not purported to be traces of the missing railroad engineers' maps, the Court has reason to believe that they have not added to or altered the boundaries agreed upon in the source deeds. As noted *supra*, all source deeds save the Cantrell deed granted HBR "sufficient width," whereas the Cantrell deed specified 75 feet. Correspondingly, the valuation maps show the width of the property interest to be 100 feet across as to the land conveyed by all source deeds with the notable exception of the Cantrell deed, documenting 37.5 feet on each side of the centerline through the Cantrell parent parcel. *See* ECF 15-18 at 7.

To be clear, North Carolina caselaw is not uniform as to the precise scope of evidence admissible to resolve a latent ambiguity. *See Cherry*, 75 S.E.2d at 128 ("The deed itself must point to the source from which evidence *aliunde* [from elsewhere] to make the description complete is to be sought." (emphasis added)). But *Cherry* is not contrary to the result reached today. Although the source deeds in this case reference the railroad engineers' maps as opposed to the railroad valuation maps, they also cite the marking and staking out of the railroad and the railroad itself. Even if the valuation maps were insufficient to resolve the source deeds' latent ambiguity, that the railroad was constructed by summer 1895—and presumably marked and staked out in the process—affords sufficient extrinsic evidence under North Carolina law to resolve the latent ambiguity, giving effect to the state's strong preference in favor of upholding deeds.

While more concrete guidance from the Supreme Court of North Carolina as to this question of law would have aided the Court in resolving this issue[20]—to borrow a phrase from Justice Thurgood Marshall—the undersigned did what he could with what he had.

B. Fee Simple

"North Carolina law presumes that conveyances of real estate are in fee simple, absent conflicting provisions in the granting instrument." *Penland v. United States*, __ Fed. Cl. __, No. 22-62, 2026 WL 1981703, at *7 (Fed. Cl. July 7, 2026) (first citing N.C. Gen. Stat. Ann. § 39-1; and then citing *McCotter*, 101 S.E.2d at 334), *appeal docketed*, No. 26-2054 (Fed. Cir. July 20, 2026). This presumption predates the 1894 source deeds at issue here. As far back as March 1879, North Carolina law provided:

[20] *See supra* note 18.

> When real estate shall be conveyed to any person the same shall be held and construed to be a conveyance in fee, whether the word "heirs" shall be used or not, unless such conveyance shall, in plain and express words show, or it shall be plainly intended by the conveyance or some part thereof, that the grantor meant to convey an estate of less dignity.

Act of Mar. 7, 1879, ch. 148, 1879 N.C. Sess. Laws 279, *available at* ECF 15-19 (current version codified at N.C. Gen. Stat. Ann. § 39-1).[21] The Supreme Court of North Carolina has long interpreted this presumption broadly. *See Vickers v. Leigh*, 10 S.E. 308, 311 (N.C. 1889) ("It is a rule of law that if two constructions can be placed on a deed, or any part of it, that shall be given to it which is most beneficial to the grantee." (internal quotation marks omitted)); *Swaim v. Swaim*, 69 S.E.2d 534, 537 (N.C. 1952) ("[A] conveyance of real estate shall be held and construed to be a conveyance in fee 'unless such conveyance in plain and express words shows, or it is plainly intended by the conveyance or some part thereof, that the grantor meant to convey an estate of less dignity.'" (quoting N.C. Gen. Stat. Ann. § 39-1)).

This Court has already twice concluded that the language included in the October 22, 1894 J. H. Ripley deed and similar source deeds "suggests an unequivocal grant of land, not an easement, and no conflicting provisions contradict this interpretation." *Bevirt*, 177 Fed. Cl. at 282, *quoted with approval in Penland*, 2026 WL 1981703, at *7. The undersigned agrees. It is hard to see how the following source deed language is "plainly intended" to convey merely an easement, which is necessary to rebut the presumption of a conveyance in fee simple: "I . . . give[,] grant[,] bargain[,] sell[,] and convey to [HBR] and its successors forever a strip of land . . . ." ECF 13-34 at 2. A "strip of land" conveyed "forever" to a railroad "and its successors" is far less suggestive of an easement than, for example, a reference to a "right of way"—a term not used in the Ripley deed or the other source deeds at issue here. *Cf. McCotter,* 101 S.E.2d at 334–35 (finding that a "deed conveyed title in fee simple to the grantee" despite "the defendants' contention that the use of the term 'right of way['] in the description limits the conveyance to an easement"); *King Assocs., LLP v. Bechtler Dev. Corp.*, 632 S.E.2d 243, 247–48 (N.C. Ct. App. 2006) (finding that a deed granting "a right of way *in, over and upon* any land or lands owned by the grantor" conveyed fee simple title).

Plaintiffs' efforts to distinguish this matter from *McCotter* and *King Associates* are unpersuasive. They argue that because the source deeds describe the impetus for the conveyance as the construction and operation of the railroad and included a provision voiding the deed if the company did not construct such a railroad by a certain date, the deeds must be construed to convey an easement to avoid surplusage. Such language, however, was not surplusage, even though the deeds conveyed fee simple title. The language describing the intended purpose of the conveyed land

[21] The 1879 and 2026 versions of the North Carolina law are substantively identical.

"may have had operative force as a restrictive covenant," but "at most it was a covenant personal to the grantors, which is no longer enforceable . . . ." *McCotter*, 101 S.E.2d at 335. As the source deeds validly conveyed fee simple title, no compensable taking has occurred.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment (ECF 13) is **DENIED**, and the government's cross-motion for summary judgment (ECF 15) is **GRANTED**. The Clerk of Court is directed to **ENTER** judgment accordingly. No costs.

It is so **ORDERED**.

Armando O. Bonilla
Judge